AO 91 (Rev. 11/11) Criminal Complaint

FILED

# UNITED STATES DISTRICT COURT
## for the
### Middle District of Florida

2018 JAN 12 PM 3:06

US DISTRICT COURT
MIDDLE DISTRICT OF FLORIDA
ORLANDO, FLORIDA

| | |
|---|---|
| United States of America<br>v.<br>Rudolph J. Oelofse<br><br>Defendant(s) | Case No.<br>6:18-mj- 1021 |

## CRIMINAL COMPLAINT

I, the complainant in this case, state that the following is true to the best of my knowledge and belief.

On or about the date(s) of __January 8, 2018__ in the county of __Volusia__ in the __Middle__ District of __Florida__, the defendant(s) violated:

| Code Section | Offense Description |
|---|---|
| 21 U.S.C. § 841 | Possession with intent to distribute a mixture and substance containing a detectable amount of marijuana. |

This criminal complaint is based on these facts:

☑ Continued on the attached sheet.

_Complainant's signature_

Chadwick Edmondson, Task Force Officer
_Printed name and title_

Sworn to before me and signed in my presence.

Date: 1/12/2018

_Judge's signature_

City and state: Orlando, FL

Hon. Karla R. Spaulding, U.S. Magistrate Judge
_Printed name and title_

STATE OF FLORIDA  Case No. 6:18-mj- 1021

COUNTY OF ORANGE

## AFFIDAVIT

I, Task Force Officer Chadwick Edmondson, having been duly sworn, hereby make the following statement in support of the attached criminal complaint:

### Agent's Background

1. I am a Task Force Officer (TFO) with the Department of Justice, Drug Enforcement Administration (DEA), that is, an officer of the United States who is empowered by law to conduct investigations of, and to make arrests for, offenses enumerated in 21 U.S.C. § 841, as well as other statutes. I am an "investigative or law enforcement officer" of the United States within the meaning of Title 18, United States Code, Section 2510(7).

2. I have been a TFO for the DEA since October 2007. I am currently assigned to the DEA's High Intensity Drug Trafficking Area Task Force (HIDTA) in the Orlando District office. In this assignment, I focus on investigations involving narcotics trafficking and money laundering. Prior to my current assignment with the DEA, I was assigned to the Lake County Sheriff's Office City/County Investigative Unit and the Florida Department of Law Enforcement Lake Narcotics Enforcement Team (NET) Task Force. In 2003, I was temporarily assigned to assist the DEA's NET Team from the Miami Field Division.

3. I have received specialized training in narcotics trafficking and money laundering from the DEA, including, but not limited to: the means and methods used by drug traffickers to import and distribute narcotics, smuggling methods, and the concealment and laundering of proceeds from illicit drug trafficking activities. I have participated in investigations concerning the possession, manufacture, distribution, and importation of controlled substances, as well as methods used to finance drug transactions and launder drug proceeds. In my capacity as a DEA Task Force Officer, I have personally participated in numerous drug investigations during which I have conducted physical and electronic surveillances, executions of search warrants, and trash pulls; analyzed information obtained from court-ordered pen register/trap and trace intercepts; analyzed telephone toll information obtained as a result of subpoenas issued by DEA; and reviewed numerous taped conversations and records of drug traffickers. I have also personally participated in numerous money laundering investigations during which I have learned of the methods used by Drug Trafficking Organizations (DTOs) to cover up the proceeds of their drug trafficking activities. I have interviewed numerous confidential sources of information and spoken to a number of DEA Special Agents, who possess years of experience in investigating the smuggling of controlled substances and money laundering schemes.

4. I am familiar with the methods employed by large-scale narcotics trafficking organizations, including the manufacture, storage, transportation, and distribution of narcotics, the collection of money that represents the proceeds of narcotics trafficking and money laundering.

5. The information set forth in this affidavit is based on my own personal knowledge, information supplied to me by other law enforcement officers and agents, and information contained within various government databases and records. Because this affidavit is submitted for the limited purpose of establishing probable cause to support the issuance of a criminal complaint, I have not included details of all aspects of the investigation. Rather, I have set forth only those facts I believe are necessary to establish probable cause that a violation of federal law has been committed.

## Investigation

6. On January 8, 2018, at approximately 9:00 p.m., U.S. Customs and Border Protection Air and Marine Operations center (AMOC) contacted Homeland Security Investigations (HSI) Special Agent (SA) Ryan Gorman and told him that a 1966 Piper PA-32-300 (Cherokee) airplane, displaying United States registration N9BG was traveling from Northern California into Florida. AMOC further advised SA Gorman the aircraft was flying under Visual Flight Rules (VFR) when Instrument Flight Rules (IFR) were in effect due to inclement weather and limited visibility. In order for a pilot to fly under IFR, the pilot must hold a specific rating, certification, or designation from the Federal Aviation Administration (FAA). According to information provided by AMOC, the presumed pilot, Rudolph J. OELOFSE, of the Cherokee airplane, was not rated to fly under IFR. Based on the inherent risk of a non-IFR rated pilot flying in IFR conditions, the time of flight, the time of landing, and the originating area being a known source location for narcotics,

namely marijuana, SA Gorman believed there was reasonable suspicion to attempt to locate the aircraft and pilot upon landing.

7. Later, the FAA advised SA Gorman that the Cherokee airplane was previously observed and stored at the New Smyrna Beach Municipal Airport in Volusia County, Florida. Based on that information, SA Gorman and I, along with other law enforcement officers, set up surveillance at the New Smyrna Beach Municipal Airport.

8. At approximately 11:00 p.m., HSI TFO Denis Smith observed the runway lights at the New Smyrna Beach Municipal Airport illuminated, which indicated that an aircraft was approaching for landing. At approximately 11:15 p.m., AMOC advised SA Gorman that the Cherokee airplane had landed and was no longer observed as being "in-flight".

9. At approximately 11:45 p.m., AMOC again contacted SA Gorman and told him that the Cherokee airplane landed on the southwest runway of the New Smyrna Beach Municipal Airport. With this information, SA Gorman, TFO Smith, and I traveled toward the southwest runway and observed two males, one of which was later identified as OELOFSE, standing in front of Hangar #37 at the rear of a black SUV. When questioned, OELOFSE told SA Gorman that he owned an aircraft and gestured toward the hangar directly behind him (Hangar #37). After further questioning, which included several hesitations and repeated questioning by law enforcement, OELOFSE finally acknowledged that he was flying from Sacramento, California, and recently landed.

10. Then, SA Gorman requested permission from OELOFSE to search the hangar and the Cherokee airplane. OELOFSE immediately refused to provide consent to search the hangar or aircraft. OELOFSE refused to answer any further questions and immediately left the airport property at a high rate of speed in the black SUV.

11. G.T.D. was identified as the second person observed by us. G.T.D. is also a pilot and has an airplane in a hangar close to OELOFSE's hangar. G.T.D. stated that he was a retired police officer from Athens, Georgia. Further investigation revealed that G.T.D. was sleeping at the hangar in anticipation of an early flight the next morning and was not involved with OELOFSE's flight. G.T.D. provided that he has known OELOFSE since July 2017 and has only observed OELOFSE store his aircraft inside of the "end unit", which he later specifically identified as Hangar #39, which directly conflicted with OELOFSE's implication that he used Hangar #37. Finally, G.T.D. stated that xxx-xxx-6100 was the phone number that he had for OELOFSE.

12. Based on the available information, law enforcement officers contacted the Volusia County Sheriff's Office and requested that a trained narcotics detection canine examine the exterior of the hangar where the Cherokee airplane was stored.

13. At approximately 12:25 a.m. (on January 9, 2018), Endo, a Volusia County Sheriff's Office canine, alerted to the presence of narcotics in Hangar #39, which was the hangar that housed OELOFSE's Cherokee airplane.

14. Endo is a German Shepard, which is trained, certified, and has proven reliable in narcotics detection. Canine Endo has been assigned to Volusia County Deputy Whitson since he was purchased by the Volusia County Sheriff's Office in 2012. Most recently, canine Endo certified in narcotics detection on November 16, 2017, through the National Narcotics Detection Dog Association. At that time, Canine Endo was once again certified on the detection of marijuana, cocaine, heroin, and methamphetamine.

15. Based on the totality of the circumstances, I obtained a state search warrant from the Honorable Raul A. Zambrano, Circuit Judge, Seventh Judicial Circuit, Volusia County, Florida. Upon executing this search warrant, law enforcement officers located six (6) large black duffle bags within the 1966 Piper Cherokee, tail number N9BG, which was located inside Hangar #39. After opening the large black duffle bags I observed, based on my training and experience, what I believe was marijuana packaged in what appeared to be one pound bags, which I know to be a common distribution weight, separation, and packaging. In total, the six (6) large black duffle bags contained approximately ninety-eight (98) kilograms of marijuana.

16. Inside Hangar #39, law enforcement also located numerous pieces of mail that were addressed to OELOFSE. In addition to the mail, I made contact with an airport employee who confirmed that OELOFSE leased Hangar #39 in his name and listed phone number xxx-xxx-6100 on the lease agreement.

## Conclusion

17. Based on my training and experience I believe that the above stated facts establish that probable cause exists to charge Rudolph J. OELOFSE for one count of possession with intent to distribute a mixture and substance of a detectable amount of marijuana, in violation of 21 U.S.C. § 841.

This concludes my affidavit.

Chadwick Edmondson, Task Force Officer
Drug Enforcement Administration

Sworn to and subscribed before
me this 12th day of January 2018.

KARLA R. SPAULDING
United States Magistrate Judge